

**Dated: November 27, 2019**

**The following is ORDERED:**

Janice D. Loyd
U.S. Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Rosalba Alvarado, | ) | Case No. 18-11961-JDL |
| | ) | Ch. 13 |
| Debtor. | ) | |
| | ) | |
| Esmeralda Avalos Tobias, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 18-01071-JDL |
| | ) | |
| Rosalba Alvarado, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER DETERMINING DEBT
NON-DISCHARGEABLE**

**I.  Introduction**

This adversary proceeding is before the Court for decision after a trial conducted

on July 31, 2019,[1] and the post-trial submission by both parties of Proposed Findings of Fact and Conclusions of Law.  Plaintiff, Esmeralda Tobias ("Tobias"), commenced this adversary proceeding seeking to have the debt owed her by Defendant/Debtor, Rosalba Alvarado ("Alvarado"), determined non-dischargeable under 11 U.S.C. § 523(a)(2)(A)[2] as having been incurred by false pretenses, misrepresentation or actual fraud.[3]

After hearing the arguments of counsel, considering all the documentary and testimonial evidence and weighing the credibility of the witnesses, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Fed.R.Civ.P., made applicable by Fed.R.Bankr.P. Rule 7052.[4]  For the reasons set forth herein, the Court finds that Tobias has met her burden of proof that the debt owed her by Alvarado is non-dischargeable.  A separate judgment will be entered pursuant to Rule 9021.

## II. Jurisdiction

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and

---

[1] All witnesses at trial testified through an interpreter, with Spanish being the primary language of all the witnesses.

[2] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

[3] The Final Pre-Trial Order entered in the case, [Doc. 54], provided that the Plaintiff's objection to dischargeability was premised upon 11 U.S.C. § 523(a)(2)(B), the dischargeability of a debt based upon a written misrepresentation of financial condition.  Prior to the commencement of the trial, the parties stipulated that reliance upon that stated section was a typographical error, and the parties agreed that the basis of the objection to dischargeability was premised upon section 523(a)(2)(A), a debt incurred by misrepresentation, false premises or actual fraud. [Doc. 59, Tr. 9-10].

[4] All future references to "Rule" or "Rules" are to the Federal Rules of Bankruptcy Procedure or to the Federal Rules of Civil Procedure made applicable to bankruptcy proceedings, unless otherwise indicated.

157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as it concerns a determination as to the dischargeability of a particular debt.

### III. Factual Findings

1.  Alvarado filed her voluntary petition for relief under Chapter 13 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*., on May 10, 2018.

2.  The last day for filing objections to discharge was August 20, 2018.  On that date, Tobias filed her Amended Adversary Complaint alleging that the debt owed her by Alvarado was obtained by fraud and thus non-dischargeable pursuant to 11 U.S.C. § 523 (a)(2)(A).

3.  Prior to the taking of any testimony at trial, counsel for both Tobias and Alvarado announced that they had stipulated as to certain facts regarding the debt owed by Alvarado to Tobias: (a) on May 19, 2017, Tobias loaned Alvarado $20,000; (b) on August 1, 2017, Tobias loaned Alvarado $30,000; (c) on November 30, 2017, Tobias loaned Alvarado $40,000; (d) on December 5, 2017, Tobias loaned Alvarado $5,000; and (e) on August 1, 2017, Tobias made a loan to Alvarado.  While the parties did stipulate to the date of the August 1, 2017 loan, Tobias asserted that the same was $15,000 while Alvarado claimed it was $5,000. [Doc. 59, Tr. 7-9].[5]

4.  Tobias and Alvarado became acquainted while they were co-workers for approximately eight years at Lopez Foods, a meat packing company in Oklahoma City. [Doc. 59, Tr. 13-14].

5.  In 2017, approximately three years after Alvarado had left working at Lopez, she

---

[5] References to Docket Entries in this Order refer to the docket in Adversary Case No. 18-01071, unless otherwise noted

called Tobias and asked if she could come meet with her at Tobias's home. She told Tobias that she had borrowed money from a woman who was pressuring her to repay the loan. [Doc. 59, Tr. 15 & 73]. Alvarado and Tobias never previously had a business relationship. On May 19, 2017, Tobias loaned Alvarado $20,000 in cash. As assurance for repayment, Alvarado gave Tobias a $50,000 check but asked her not to cash it. [Doc. 59, Tr. 18]. Alvarado later got the check back from Tobias. [*Id.*]

6. On June 6, 2017, Tobias loaned Alvarado $25,000 cash which Tobias had borrowed from her brother. At that time, Alvarado told Tobias that she had issued checks on her brother's account with which to pay Tobias, but the checks had been stolen and she thus didn't have the money to pay Tobias. [Doc. 59, Tr. 19]. That was the reason she borrowed the additional $25,000. [*Id*.]

7. On June 13, 2017, Alvarado told Tobias that someone in her family or a friend had been arrested and she, Alvarado, needed to borrow another $20,000.[6] [Doc. 59, Tr. 21]. Alvarado told Tobias that she was going to be able to repay Tobias for all the loans with the proceeds of a job which she and her brother, with whom she was in business, were expecting in the amount of $200,000. [Doc. 59, Tr. 22 - 23].

8. Tobias testified that on August 1, 2017, Alvarado borrowed another $45,000 in cash from Tobias. [Doc. 59, Tr. 24]. Again, Tobias didn't have those funds, and so she borrowed cash from her father to make the loan. [Doc. 59, Tr. 25]. To secure payment of the loan, an English-speaking notary and friend of Alvarado drew up an agreement which

---

[6] Tobias's proposed Findings of Fact and Conclusions of Law assert that the loan of June 13, 2017, was in the amount of $23,000. The trial transcript indicates it was for $20,000. [Doc. 59, Tr. 21].

4

provided that Tobias would take ownership of Alvarado's home in the event that Alvarado failed to pay Tobias the $45,000 by September 1, 2017. [Doc. 59, Tr. 24-25]. Tobias claimed that the document, as written in English, did not represent her understanding of the agreement. [Doc. 59, Tr. 25].

9.    Alvarado first testified, contrary to Tobias's testimony about her borrowing $45,000, that on August 1, 2017, she borrowed $10,000. She then testified that she did borrow $30,000 around August 1, 2017, and then borrowed $10,000 about "a day apart" or maybe together. [Doc. 59, Tr. 82]. She testified that the $10,000 was to repay her brother's business from which she had borrowed $11,000 with which she had repaid Tobias in two payments of $6,500 each [Doc. 59, Tr. 84] for interest due on the loans. [Doc. 59, Tr. 80-81]. These payments to Tobias were paid in cash at a gas station, the location of which Alvarado could not recall. No receipts were produced to collaborate these payments being made.

10.    Alvarado did produce one check in the amount of $8,000 made payable to Esmeralda Tobias dated September 10, 2017 showing an endorsement by Tobias on September 15, 2017. [Doc. 59, Tr. 37-38]. Tobias, however, did not recall receiving this check, but does recall receiving cash in the amount of $1,500. [Doc. 59, Tr. 39]

11.    On November 30, 2017, Alvarado borrowed another $40,000 from Tobias. Tobias testified that Alvarado told her that she needed the $40,000 to finish a construction job "and they had to go and pour the concrete or otherwise the whole job was going to be lost." [Doc. 59, Tr. 27]. Tobias further testified that Alvarado told her that "with that job she was going to pay everything off." [*Id*.]. Tobias believed that Alvarado was going to "pay everything back to me based on that job." [Doc. 59, Tr. 28].

5

11.    Alvarado testified that she borrowed the $40,000 for a friend of hers that was returning to Mexico to help her ailing mother who eventually passed away. [Doc. 59, Tr. 87-88].   She further testified that she didn't tell Tobias that she was borrowing the $40,000 to give to someone else because Tobias "never asked me." [Doc. 59, Tr. 90].   Alvarado admitted that "I know she (Tobias) thinks that the loan was for me, but the money was not for me", and  "that money was for a person that is in Mexico." [Doc. 59, Tr. 87].   Alvarado testified that when she borrowed the $40,000 on November 30, 2017, her and her brother's concrete/pavement business was not operating and that she had no way to repay the loan. [Doc. 59, Tr. 105].

13.    On December 5, 2017, Alvarado borrowed another $5,000 from Tobias. [Doc. 59, Tr. 91].   Alvarado testified that she needed the $5,000 to deposit in her bank account in order to qualify for a bank loan. [Doc. 59, Tr. 91-92].   She didn't get the bank loan, but she never repaid Tobias the $5,000 because while she could have "I had other plans for me to be able to pay her but it didn't work." [Doc. 59, Tr. 92].   To the contrary, Tobias testified that the $5,000 loan was made because Alvarado told her that "she had a license to be able to work in roofing" and "told me that she was going to Florida, that there was a lot of work over there, and she could get all the money very quickly." [Doc. 59, Tr. 31].

14.    Tobias testified that she made another $5,000 loan on December 15, 2017, again based on Alvarado's representation that she needed the money to go to Florida for work. [Doc. 59, Tr. 31].   Alvarado testified that she did not borrow the $5,000 on December 15, 2007. [Doc. 59, Tr. 91].   There was no testimony that Alvarado ever went to Florida to do roofing jobs.   Alvarado testified that she borrowed the money from Tobias in order to pay people from whom she had previously obtained loans and to replace funds in her and

her brother's business which she had taken money from. [Doc. 59, Tr. 94].

## IV.  The Law

### A.  Exceptions to Discharge-General Considerations

A discharge of indebtedness in bankruptcy is reserved for the "honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of the bankruptcy." *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695 (1934); *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654 (1991).  In order to effectuate this "fresh start" policy of bankruptcy relief, exceptions to discharge are narrowly construed with all doubts resolved in the Defendant's favor.  *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997); *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 782 (10th Cir. BAP 1998); *Miller v. Gentry (In re Miller)*, 55 F.3d 1487, 1489 (10th Cir.), *cert. denied*, 516 U.S. 916, 116 S.Ct. 305 (1995).  The burden of proof for establishing an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654 (1991).

### B.  Section 523(a)(2)(A)

Section 523(a)(2)(A) is phrased in the disjunctive, meaning that false pretenses, false representation and actual fraud are three separate grounds for non-dischargeability, and these independent causes of action require proof of different elements.  *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222-23 (10th Cir. BAP 2013); *Houston v. Munoz, (In re Munoz)*, 536 B.R. 879, 884 (Bankr. D. Colo. 2015); *In re Call*, 560 B.R 814, 821 (Bankr. D. Utah  2016).  While the elements for each theory under § 523(a)(2)(A) differ, the common thread is a debtor's intent to defraud a creditor.  *Munoz,* 536 B.R. at

884; *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996). Because false pretenses and actual fraud represent different concepts, they have somewhat different meanings and each one merits a brief discussion. The Court will outline the elements for each cause of action in the order set forth in § 523(a)(2)(A).

### 1. False Pretenses

False pretenses under § 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression. *In re Sturgeon*, 496 B.R. 215, 223 (10th Cir. BAP 2013). Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions. *Id.* See *Marks v. Hentges (In re Hentges),* 373 B.R. 709, 725 (Bankr. N.D. Okla. 2007) (false pretenses are "implied misrepresentations or conduct intended to create and foster a false impression."). See also *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1374-75 (10th Cir. 1996) (failure to disclose may constitute a false representation or false pretenses); *Harmon v. Kobrin, (In re Harmon)*, 250 F.3d 1240, 1246, n. 4 (9th Cir. 2001); *The William W. Barney, M.D. P.C. Retirement Fund v. Perkins (In re Perkins)*, 298 B.R. 778, 788 (Bankr. D. Utah 2003) (stating that "[a] false pretense as used in § 523(a)(2)(A) includes material omissions, and means implied misrepresentations or conduct intended to create and foster a false impression."); *Call*, 560 B.R. at 821 (Bankr. D. Utah 2016) ("false pretenses can be 'defined as any series of events, when considered collectively, that create a contrived and misleading understanding of the transaction, in which a creditor is wrongfully induced to extend money or property to the debtor.'" (citing *Stephens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa 2006)).

8

## 2. Misrepresentation

To prove that a debt arose from false representation, the plaintiff must prove by a preponderance of evidence the traditional, long-standing elements for proving misrepresentation or fraud under the common law of torts in the *Restatement (Second) of Torts,* § 525 (1976) as understood when § 523(a)(2)(A) was enacted in 1978. See *Field v. Mans*, 516 U.S. 59, 69, n. 9, 116 S.Ct. 437, (1995).  Those elements are (1) that the debtor made a false representation; (2) the representation was made with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was justifiable; and (5) the creditor was damaged as a result. *Id.; Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *In re Riebesell*, 586 F.3d 782, 789 (10th Cir. 2009).  Furthermore, where there is a duty to speak both concealment and silence can constitute fraudulent representations.   A misrepresentation is not required to constitute fraudulent representation.   As stated in *In re Hentges*, 373 B.R. 709, 723 (Bankr. N.D. Okla. 2007):

> "When a debtor has an affirmative duty to disclose information, the failure to convey the information may be considered a false representation for purposes of Section 523(a)(2). Moreover, 'false pretenses as used in § 523(a)(2)(A) includes material omissions, and means 'implied misrepresentations or conduct intended to create and foster a false impression.'  An overt misrepresentation is not required, because omissions or failure to disclose on the part of the debtor can constitute misrepresentations for the purpose of non-dischargeability where the circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor." (citations omitted).

Nevertheless, "an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive." *In re*

*Johnson,* 477 B.R. 156, 173 (10th Cir. BAP 2012).

### 3.  Actual Fraud

In *Husky International Electronics, Inc. v. Ritz,* ___U.S.____, 136 S.Ct. 1581 (2016) the Supreme Court stated that, to the extent "actual fraud" is alleged, such term does not require an actual misrepresentation on the part of the wrongdoer. *Id.* at 1587.  Often times, prior to *Husky,* courts used the terms "fraudulent representation" or "actual fraud" interchangeably; however, *Husky* clearly recognized the distinction between the various types of fraud set forth in § 523(a)(2)(A).  The Supreme Court did not define with precision what acts constituted "actual fraud"; rather, it cryptically noted the term "fraud" has been defined broadly to be "anything that counts as fraud and is done with wrongful intent" and connotes "deception or trickery". *Id.* at 1586; *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1,11 (10th Cir. BAP 2016); *Call*, 560 B.R. at 821.  This definition is similar to that stated by the Tenth Circuit BAP in *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 690 (10th Cir. BAP 2013) wherein the court held that "[w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." Wrongful intent can be manifested  "when a debtor intentionally engages in a scheme to deprive or cheat another of property or legal right." *Thompson,* 555 B.R. at 10.

### 4.  Scienter-Intent Required For Any § 523(a)(2)(A) Cause of Action

Although false pretenses, false representation, and actual fraud represent different concepts, the elements of scienter, reliance, and materiality are common to all and must be proven by a preponderance of the evidence in order for the creditor to prevail.

10

In the Tenth Circuit any of the three types of conduct specified in § 523(a)(2)(A) (false pretenses, misrepresentation or actual fraud) have been narrowly construed to limit the harsh result of nondischargeability to "frauds involving moral turpitude or intentional wrong." *In re Johnson*, 477 B.R. 156, 169 (10th Cir. BAP 2012). "[F]raud implied in law or which may arise in the absence of bad faith or immorality" is not sufficient. *Id.*; *Kukuk*, 225 B.R. at 787 (quoting *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986) (abrogated on other grounds by *Grogan*, 498 U.S. 279, 111 S.Ct. 654). The debtor must have acted with the subjective intent to deceive the creditor. *First National Bank v. Cribbs (In re Cribbs )*, 327 B.R. 668, 674 (10th Cir. BAP 2005), *aff'd,* 2006 WL 1875366 (10th Cir. 2006). Because fraudulent intent is rarely admitted by a debtor, courts uniformly recognize it may be established by circumstantial evidence or by inferences drawn from a course of conduct or from the totality of the circumstances. *Cribbs*, 327 B.R. at 673; *Copper v. Lemke (In re Lemke),* 423 B.R. 917, 922 (10th Cir. BAP 2010) (citing *Young*, 91 F.3d at 1375); *In re Graham*, 600 B.R. 90 (Bankr. D. Kan. 2019). The "totality of the circumstances inquiry is fact specific and hinges on the credibility of witnesses." *Id*. at 95-96.

### V.  Discussion

#### A.  Debtor's Misrepresentation and Actual Fraud.

As a predicate for this opinion, the Court makes the following observations regarding credibility because much of this case hinges upon the credibility of the parties. The intent to deceive is largely an assessment of the credibility and demeanor of the debtor. *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994). The Court had the opportunity to hear the testimony of both Tobias and Alvarado and observe their demeanor. The Court finds that

11

Tobias, although naïve, was credible, and the little documentary evidence admitted during the trial corroborated her testimony. On the other hand, the Court finds that Alvarado was not credible. Her self-serving testimony that she intended to repay Tobias is belied by the facts. In the space of seven months she borrowed approximately $160,000 from Tobias at a time that she, Alvarado, was making $15.75 an hour at Lopez Foods plus approximately $8,000 a year from her and her brother's concrete/paving business. [#18-11961, Schedules I and J, Doc. 1; Employee Income Records, Doc. 5; Statement of Financial Affairs, Doc. 1, pgs. 44-46]. Alvarado admitted in her testimony that the initial $20,000 loan was to repay a loan from another acquaintance because Alvarado didn't have the income to repay it herself. [Doc. 59, Tr. 73]. Other funds were borrowed to replace funds Alvarado had taken from her brother's business, in what appeared to be a classic "robbing Peter to pay Paul" situation. It was obvious to the Court that Alvarado never had sufficient funds with which to repay Tobias, and yet she kept borrowing more.[7] This is evidenced by the fact that even when she allegedly repaid Tobias the $11,000 in interest she simultaneously borrowed another $10,000 to cover the interest payment which she had just made. Other than perhaps the first $20,000 loan, the evidence supports the conclusion that the future borrowings were part of a scheme/cheat or deception by Alvarado to take financial advantage of her friendship with Tobias. She was going to milk the cash-cow for everything she could without the means to repay it.

While the law is clear that a finding of non-dischargeability under § 523(a)(2)(A)

---

[7] Unfortunately, other than testimony as to the $40,000 that Alvarado borrowed from Tobias and gave to a friend there was no real evidence as to what happened to well over $100,000 that Tobias loaned Alvarado, most of which was in cash. There was no evidence from either party as to tracing the loan proceeds.

12

need not be based upon a misrepresentation, there clearly was misrepresentation as to loan of $40,000 made on November 30, 2017. Tobias testified that Alvarado told her she needed the money to start doing roofing jobs in Florida which would generate enough income to pay Tobias for the loans. [Doc. 59, Tr. 27]. It was upon this representation that Tobias relied upon to attempt to get herself out of the desperate financial circumstances in which Alvarado placed her. The story about work in Florida, however, was false. As Alvarado herself testified at trial, the $40,000 she borrowed was in fact given to a friend of hers who needed money to return to Mexico to take care of her ailing mother. Alvarado acknowledged that Tobias "thinks that the loan was for me, but that money was not for me. That money was for a person that is in Mexico." [Doc. 59, Tr. 87].

When credit is extended for a specific purpose, a relevant indicator of fraudulent intent will be determined based on whether the debtor uses the extension of credit for its intended purpose. *Matter of Pappas*, 661 F.2d 82, 86 (7th Cir. 1981) (holding "[t]hat where the bankrupt is entrusted with money to be used for a specific purpose, and he has no apparent intention of using the money for that purpose, then a misrepresentation clearly exists upon which a debt can be properly held non-dischargeable.") (Citing, 1A Collier on Bankruptcy P 17.16(3) at 1638 (14th ed. 1978)).

If the extension of credit is not used for its stated purpose, a strong inference arises that the debtor never intended to perform her promise. In fact, depending upon the egregiousness of the misrepresentation, a debtor's failure to utilize funds extended by credit for the stated purpose may be dispositive on the issue of the debtor's fraudulent intent. That is the situation here. By November 2017, Tobias had loaned Alvarado well over $100,000 which had not been repaid. Tobias testified that she was "desperate" as

13

she had borrowed the great majority of the funds from her father and her brother (who had given the proceeds of the sale of his house to Tobias without knowing she was loaning the money to Alvarado).  Tobias believed that the only way she stood a chance of getting repaid was to loan the $40,000 so that Alvarado and her brother could complete their construction jobs.  Instead, Alvarado gave the $40,000 to a friend in Mexico.  The Court finds Alvarado's actions to be particularly egregious.

### B.  Plaintiff's Reliance.

Alvarado argued at trial that Tobias did not reasonably or justifiably rely upon any representations or conduct of Alvarado because she failed to investigate Alvarado's credit record or verify other financial information.  It is true that under the common law, and thus by extension § 523(a)(2)(A), a duty is imposed upon a person to be diligent in safeguarding their interest; a person who is not diligent is deemed to have assumed the risk, and precluded from maintaining an action for fraud.  Applying the common law, the United States Supreme Court in *Field v. Mans* held that the standard for reliance under section 523(a)(2)(A) is that of justifiable, as opposed to the higher standard of reasonable reliance. 516 U.S. 59, 74-75, 116 S.Ct. 437 (1995).  In *Eugene Parks Law Corporation Defined Benefit Pension Plan v. Kirsch*, *(In Re Kirsh)* 973 F.2d 1454, 1459 (9th Cir. 1992), the Ninth Circuit explained justifiable reliance as this:

> "the standard is not that of the average reasonable person. It is a more subjective standard which takes into account the knowledge and relationship of the parties themselves. Thus, 'a person of normal intelligence, experience and education ... may not put faith in representations which any such normal person would recognize at once as preposterous'.  At the same time, the standard does protect the ignorant, the gullible, and the dimwitted, for 'no rogue should enjoy his ill-gotten plunder for the

14

simple reason that his victim is by chance a fool'."

(Quoting *Prosser and Keeton on the Law of Torts*, § 108 at 749-751(5th ed. 1984). Courts have found the idea of imposing a duty to verify on creditors to be distasteful. See, *La Trattoria, Inc. v. Lansford, (In re Lansford),* 822 F.2d 902, 904 (9th Cir. 1987) ("Having intentionally misled the sellers in an area he knew was important to them, it is unseemly for the debtor to now argue that he should be excused from § 523 because the debtor's actually believed him."); *In re Hough,* 111 B.R. 445, 450 (Bankr. S.D. N.Y. 1990) (The court finding it "inappropriate for the debtors to argue that their debt to the plaintiff should be dischargeable because the plaintiff believed them....")

The intentional nature of the debtor's conduct was also the focus of the court's comments in *In re Richards*, 71 B.R. 1017, 1021 (Bankr. D. Minn. 1987):

> "It is not a defense to an action for battery that the victim negligently failed to see it coming, or that he did not use all reasonable means to avoid the blows. It is no less absurd for one who defrauds another to defend against the consequences of the act by arguing, in effect, `Yes, I lied, and deceived the plaintiff for my gain and his loss, but it was his own fault for trusting me. He should have been more careful, and I should not be held accountable'."

The Court is not implying that Tobias was a fool or incompetent. It does find from her testimony and demeanor that she was a sincere, kind person who trusted a woman with whom she had worked for eight years, regarded as a friend and with whom she had a rapport. Here, while in retrospect Tobias's reliance may not have been reasonable, what makes her reliance justifiable was the nature of her relationship with Alvarado prior to the loan transactions. Their transactions cannot be considered completely at arms length, thereby lessening the degree of diligence necessary for Tobias to establish that she

15

justifiably relied on Alvarado's misrepresentations. Court's have frequently looked to whether the debtor and the creditor had an on-going relationship, either personal or business, in assessing whether the creditor's reliance on the debtor's representations or financial statements was reasonable. See *eg., Leadership Bank, N.A. v. Watson, (In re Watson)*, 958 F.2d 977 (10th Cir. 1992).

For the above reasons, the Court finds that Tobias has sustained her burden of establishing that in part her prepetition extension of credit to Alvarado in the amount of $132,000.00 constitutes a non-dischargeable debt for purposes of § 523(a)(2)(A).[8] The Court finds the there is insufficient evidence to meet Tobias's burden that the initial $20,000 loan was fraudulently incurred. In reaching the conclusion found herein, the Court's considered all the evidence and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED**, that claims held by the Plaintiff, Esmeralda Avalos Tobias, in the amount of $132,000 against Defendant/Debtor, Rosalda Alvarado, are hereby determined to be **NON-DISCHARGEABLE DEBTS.**

**IT IS FURTHER ORDERED** that pursuant to Rules 7058 and 9021, a separate judgment will be entered in favor of the Plaintiff, Esmeralda Avalos Tobias.

**# # #**

---

[8] The judgment amount is based on the $25,000 loan of June 6, 2017; $20,000 loan of June 13, 2017; the $45,000 loan of August 1, 2017; the $40,000 loan on November 30, 2017; the $5,000 loan of December 5, 2017; and the $5,000 loan of December 15, 2017; less the $8,000 payment made by check by Alvarado. The total excludes the initial $20,000 loan of May 19, 2017.